FILED
Aug 27, 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

Jamie Osuna, CDCR #BD0868
CSP-COR PO Box 8800
Corcoran, CA 93212,
Plaintiff,

v.

GENA JONES; RON BROOMFIELD; JAMES HARDEN; EDWARD J. SILVA; A. JOHNSON; KEVIN R. MATTA; J. ZAMORA; VINCENT TAPIZ; C. JACKSON; G. GARZA; JENNIFER BENAVIDEZ; TAMMY CAMPBELL; A. GUERRERO; A. BETANCOURT; R. ESPINO; and J. GONZALES,
Defendants.

No. 1:26-cv-06848 - EGC (PC)

**CIVIL RIGHTS COMPLAINT**
42 U.S.C. § 1983

**CLAIMS**
1. Eighth Amendment Excessive Conditions of Confinement
2. Fourteenth Amendment Procedural Due Process
3. Eighth Amendment Mental-Health and Safety Risks

**DEMAND FOR JURY TRIAL**

## I. JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under federal law and seeks relief under 42 U.S.C. § 1983 for deprivations of federal constitutional rights under color of state law.
2. Venue is proper in the Eastern District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions occurred at in Kings County, California.

## II. INTRODUCTION

3. Plaintiff Jamie Osuna is a California prisoner housed at California State Prison-Corcoran. After completing his determinate SHU term in October 2023, he remained in Administrative RHU/SHU or equivalent restrictive housing through January 8, 2026, with the placement and its consequences continuing thereafter.
4. Defendants continued that confinement using false, withheld, incomplete, or contradictory disciplinary, mental-health, confidential-information, Security Threat Group (STG), safety, and classification material. Plaintiff disputed the material and supplied contrary records. Granted or adjudicated grievances and confidential-information disclosures also gave Defendants notice of staff-linked dissemination, inflammatory narratives, and resulting safety threats that remained unresolved.

5. Plaintiff's prolonged restrictive confinement imposed an atypical and significant hardship in relation to ordinary prison life.

6. Plaintiff is a documented, severely mentally ill inmate-patient and a *Coleman* class member. Defendants have subjected Plaintiff to punitive segregation to exacerbate his documented mental-health behaviors and symptoms. Plaintiff alleges that he has been housed under excessive conditions of confinement in Corcoran administrative segregation without procedural or substantive due process and, at times, without notice, opportunities to participate in committee proceedings, or meaningful review. Defendants knew and were made aware of the problems and of the risk that unwarranted punishment had been, was being, and would be inflicted. Defendants failed to act. Some took only ineffective action under circumstances indicating that Defendants' response to the problems was part of deliberate indifference to Plaintiff's plight. Plaintiff's allegations demonstrate a causal connection: Defendants used administrative segregation unconstitutionally to house Plaintiff, whose mental-health condition was being exacerbated by the deprivations of confinement. Plaintiff suffered inappropriate disciplinary treatment and placement in an administrative-segregation unit despite his well-documented mental illness.

7. Plaintiff does not assert a freestanding right to a particular classification, privilege group, housing assignment, or institution; seek to enforce *Coleman* or *Ashker*; or challenge any individual Penal Code section 2602 proceeding. Those matters are alleged only as evidence of the challenged retention process, Defendants' knowledge of the risks, and available less restrictive or protective measures.

## III. PARTIES

8. Plaintiff Jamie Osuna is a California prisoner housed at California State Prison-Corcoran.

9. At all relevant times, Defendants acted under color of state law. All Defendants except SILVA are sued individually for damages. JONES and HARDEN are also sued in their official capacities, and SILVA solely in his official capacity, for prospective relief.

10. Defendant GENA JONES is Director of CDCR's Division of Adult Institutions. She held that position during the Jan. 16, 2025, and Jan. 8, 2026, Departmental Review Board (DRB)

proceedings and actively participated in the Board's collective decisions continuing Plaintiff's restrictive placement.

11. Defendant RON BROOMFIELD chaired and actively participated in the Jan. 18, 2024, collective DRB decision continuing Plaintiff's restrictive placement.

12. Defendant JAMES HARDEN was then a Special Agent in Charge in CDCR's Office of Correctional Safety (OCS), actively participated as the OCS representative in the Jan. 18, 2024, collective DRB decision, and is now Chief of OCS.

13. Defendant EDWARD J. SILVA is the current Warden of CSP-Corcoran.

14. Defendant A. JOHNSON was a CSP-Corcoran unit captain with direct tier and cell access who participated in the Institution Classification Committee (ICC) referral and retention proceedings.

15. Defendants KEVIN R. MATTA, J. ZAMORA, C. JACKSON, and G. GARZA were correctional counselors with direct cell access. MATTA and ZAMORA participated in ICC proceedings; ZAMORA, MATTA, GARZA, and JACKSON were assigned to prepare Plaintiff for ICC and DRB hearings; and all four delivered or reviewed hearing materials or addressed staff-assistance or periodic-review duties.

16. Defendant VINCENT TAPIZ was a Classification Services Unit specialist who summarized records for DRB, actively participated in Plaintiff's 2024, 2025, and 2026 reviews, and materially supported the Board's collective decisions.

17. Defendant JENNIFER BENAVIDEZ was a Division of Adult Institutions deputy director who actively participated in the Jan. 16, 2025, collective DRB decision and controlled Plaintiff's opportunity to present his position.

18. Defendant TAMMY CAMPBELL was Warden of CSP-Corcoran. She was present on Plaintiff's tier; received, reviewed, or delegated responses to grievances and requests concerning hazardous conditions, self-injury, isolation, and programming; removed him from ETO or educational programming; and reviewed and approved the Feb. 20, 2024, ICC Chrono continuing Administrative RHU by signing it.

19. Defendant A. GUERRERO was a CSP-Corcoran ISU/IGI or safety official who prepared or

supplied the Oct. 2023 safety report and Dec. 28, 2023, assessment used in ICC or DRB decisions. Defendants A. BETANCOURT and R. ESPINO were ISU/IGI or safety officials who conducted the relevant safety and placement assessment. Defendant J. GONZALES authored or supplied later confidential-source material used during DRB proceedings.

## IV. ADMINISTRATIVE REMEDIES AND AVAILABILITY

20. Plaintiff exhausted available administrative remedies through COR-HC-26000143, concerning missing or unprocessed grievances; grievance 624097, concerning safety threats and inmate reactions arising from Corcoran/CDCR staff media activity, dissemination, and inflammatory narratives about Plaintiff; and grievance 686399, concerning the warden's removal of Plaintiff from ETO/educational programming.

21. The grievance process was also obstructed. After the Jan. 18, 2024, DRB, MATTA told Plaintiff the decision could not be grieved and only an attorney petition could challenge it. When Plaintiff said he would grieve and pursue § 1983 relief, MATTA said the grievance would be returned, adding "good luck" and "we'll see." TAPIZ first directed him to grieve, then told him to "take it to committee." COR-HC-26000143 documented other grievances not returned or processed.

## V. FACTUAL ALLEGATIONS

### A. Restrictive Conditions and Direct Notice — Eighth Amendment Deliberate Indifference

22. Before May 2023, Plaintiff's bed history showed long-term restrictive or administrative-segregation placements beginning around 2018, interrupted by crisis-bed, acute/intermediate-care, psychiatric-inpatient placements, followed by returns to restrictive housing. The May 2, 2023, hearing was pre-MERD; the Oct. 10 hearing and Oct. 16 Chrono acknowledged completion of the determinate SHU term, after which Administrative RHU or equivalent confinement continued through filing. This history shows duration, vulnerability, and notice.

23. During the challenged period, Plaintiff spent most days, sometimes consecutive twenty-four-hour periods, in a small, almost entirely concrete cell with a slab bed, no chair, no inmate-accessible electrical outlet, and no separate surface for food, writing, or property.

24. For approximately one year, Plaintiff received yard only a few times and sometimes remained

in-cell for consecutive days with almost no ordinary interpersonal contact. Any one-hour noncontact visits required strip searches before and after. He received no out-of-cell educational, vocational, or rehabilitative programming and was denied most general-population privileges; telephone/tablet access, packages, property, clothing, and canteen were materially restricted, including an approximately 75% canteen reduction. These conditions were substantially harsher than ordinary prison life.

25. Plaintiff took heat-warning medication and requested a fan, but Corcoran denied one while the Interdisciplinary Treatment Team or ICC granted individualized fan overrides to other RHU prisoners. He was also denied personal blue jeans and limited in the number of law books, legal materials, and other property he could keep. He raised these conditions and the more restrictive privilege matrix with counselors, ICC, and through grievances. During consecutive days above 100°F, his RHU unit allegedly was Corcoran's only unit not following heat procedures: staff provided cool water but no ice or ice water and no comparable sprayers, cooling areas, or other relief. He grieved these failures in grievance 927328.

26. Plaintiff's records documented a serious mental disorder, paranoia, depression, anxiety, persecution concerns, impaired hygiene and daily functioning, recurring serious self-injury, crisis or suicide-watch placements after self-harm or psychosis, decompensation, and recommendations for EOP or higher care. In May–June 2023, clinician C. Angel and the treatment team approved or initiated EOP before Corcoran and statewide supervisors reversed it. ZAMORA later said even a criminal-court transfer order could be overridden through an asserted Correctional Clinical Case Management System (CCCMS) or level-of-care block to keep Plaintiff at Corcoran. Plaintiff suffered self-injury wounds, pain, and heat-related illness requiring medical care while denied a fan on heat-warning medication; confinement aggravated his symptoms and self-harm risk. An Oct. 2018 program note in his file recognized that prolonged isolation could worsen mental-health symptoms and recommended reading materials, group/programming, and approved appliances to promote socialization.

27. Plaintiff repeatedly told MATTA, ZAMORA, JACKSON, GARZA, ICC, and DRB that isolation, heat, lack of exercise, and lack of meaningful activity were worsening his

psychiatric symptoms, self-harm, physical health, and functioning. He showed them records reflecting his Test of Adult Basic Education score, Penal Code section 2602 findings, crisis placements, prior EOP care, and staff-assistance history.

28. Plaintiff also reported at cell-front contacts, ISU/IGI interviews, and ICC and DRB hearings that Corcoran and the proposed yards were unsafe because of staff-linked inflammatory narratives and media activity, false sex-related and STG narratives, and resulting public and inmate threats.

**B. Prior Records Used for Retention — Fourteenth Amendment Due Process**

29. An August 23, 2017, ICC determined that mental illness contributed to Plaintiff's conduct, reversed the resulting RVR, released him to EOP, and required staff assistance in future classification reviews, consistent with CDCR procedures restricting discipline for conduct caused by serious mental-health symptoms. Other records documented TABE scores below 4.0, including 2.6, and prescribed simple-English and read-aloud measures.

30. A July 31, 2019, segregation profile by M. Perez identified Plaintiff as EOP but listed no gang status, moniker, sex-related history, or double-cell authorization. On Jan. 19, 2020, Sgt. Ivan Razo signed or prepared a CDC 114-A1 profile identifying Plaintiff as CCCMS, marking sex-related offenses or disciplinary history, listing gang status "25'er" and moniker "Joker," marking "No" for prior suicide attempts, and carrying a Sep. 14, 2023, MERD. It identified no formal STG-validation decision or documented basis for the gang designation, yet its entries and derivative STG characterizations were used in the 2023 MERD and classification process.

31. Other CDCR records directly contradicted Razo entries: they documented prior crisis placements, self-harm, stated "Sex Offender History: None," and "With STG Nexus: No."

32. Plaintiff alleges a 2021 SVSP committee neither entered the incident reports underlying an RVR involving LCSW P. Barnes into SOMS/ERMS nor supplied them after Corcoran requested them around 2023. He told the 2023 ICC defendants that the conduct occurred at SVSP while he was court-ordered there per incompetency finding, receiving high-level mental-health treatment, under Penal Code section 2602. He identified the August 23, 2017,

disposition, missing 2021 records, lack of recent SHU-eligible conduct, current behavior, and less restrictive alternatives. ICC and DRB nevertheless treated the eight-month SHU term as established and continued using the old, incomplete, or clinically disputed conduct without obtaining the missing incident, hearing, or disposition records, reconciling the mental-health findings, or allowing meaningful challenge. The term was fully served by Oct. 2023.

33. Plaintiff repeatedly opposed Penal Code section 2602 and sought termination. Section 2602 materials attributed specified conduct to psychosis, grave disability, danger to self or others, lack of insight, and likely decompensation without forced medication, while overlapping RVR and ICC/DRB records treated the same conduct as willful misconduct requiring isolation. Other ICC records described adequate functioning, effective communication, no available TABE score, or a personality-disorder presentation. Dr. Supervici signed or approved portions of the section 2602 interview, consideration, or preparation materials; told Plaintiff the review considered RVRs, behavior, and insight into mental illness; and separately said he needed to change his behavior. Plaintiff showed MATTA, ZAMORA, JACKSON, GARZA, ICC, and DRB that the same conduct was treated as illness-driven for involuntary medication but willful for isolation. Later decisions did not reconcile mental-health responsibility, current dangerousness, treatment needs, or less restrictive housing.

**C. May–Oct. 2023 ICC Proceedings — Procedural Due Process and Referral to DRB**

34. Before the Oct. 10, 2023, ICC, Plaintiff informed JOHNSON, ZAMORA, MATTA of staff-linked media activity, online threats, setup concerns, High Notoriety and public-interest records, mental-health difficulties, dangers on proposed Level IV yards. He requested restored file-security designations, transfer from Corcoran to PHU, RCGP, or a safer non-designated or 50/50 yard. ZAMORA said PHU and enhanced file security were for celebrities and Plaintiff did not qualify; JOHNSON agreed and said Plaintiff was known only at Corcoran.

35. JOHNSON told Plaintiff, in substance, “Just say you don’t have any safety concerns and are willing to go to a 180 yard—Tehachapi or Kern Valley.” Plaintiff responded, “If my notoriety and safety concerns are not mentioned, and if I agree to go to those yards and say I don’t have any problems, and something happens, you guys will blame me.” JOHNSON said, “I don’t

hear nothing you're saying. So, are you going to agree? Once they do DRB, there's no going back. You're not coming out. You're going to do at least 10 years [in SHU/RHU] regardless of what you do." JOHNSON also stated, "Well, it looks like you don't want to go out. I don't hear you. Well, it looks like you want to stay back here." When Barbara McKinney asked, "What's he gonna do?" JOHNSON shrugged and said, "Let's move on. Let's go." The exchange conditioned release on Plaintiff falsely renouncing documented safety concerns and accepting identified Level IV yards or facing prolonged isolation through DRB.

36. A June 29, 2023, Chrono documented the May 2 pre-MERD ICC, chaired by T. Henne with MATTA, ZAMORA, JOHNSON, and clinician C. Angel. ICC continued Plaintiff in pre-MERD administrative or long-term restrictive housing and recorded that release posed an immediate threat to Plaintiff, others, and institutional security. The same Chrono said Plaintiff refused to attend but also recorded, "Agrees with Recommendations: Yes" and "Informed of Appeal Rights: Yes." Plaintiff did not agree and disputes receiving the recorded explanation, notice, preparation, assistance, or opportunity to review and answer all information.

37. An Oct. 9, 2023, Corcoran ISU/IGI memorandum prepared or supplied by A. GUERRERO stated that no verified systemic safety concern prevented Plaintiff from programming anywhere, treated his concerns as unverified, and described him as assaultive toward staff and inmates despite no inmate assault in 2023. Plaintiff disputed that characterization. The memorandum did not reconcile the High Notoriety determinant, staff-linked dissemination, online threats, identified unsafe yards, or then-available setup and targeting information. The Oct. 16 Chrono for the Oct. 10 ICC identified MATTA, ZAMORA, JOHNSON, T. Henne, Barbara McKinney, clinician S. Nguyen, A. GUERRERO, and V. Pena. Although it noted completion of the determinate SHU term, ICC referred Plaintiff to DRB for administrative retention and partly relied on the disputed 2021 RVR/eight-month term. GUERRERO's reporting and the ICC rationale also omitted or removed the danger-to-self designation without reconciling contemporaneous section 2602 danger-to-self and grave-disability findings, repeated crisis placements and self-injury, *Coleman* Project Team intervention, or hazards challenged in *Osuna v. Campbell*. The omission minimized the mental-health conflict

with isolation, enabled Corcoran retention, and carried into later review.

38. The Oct. 16, 2023, Chrono stated Plaintiff was present, agreed, and received all required process. He disputes agreeing or receiving the recorded assistance or opportunity to respond. From May 2023 through Jan. 2026, MATTA, ZAMORA, JACKSON, or GARZA delivered materials before the identified ICC and DRB hearings but declined requested assigned assistance, stating in substance, "I'm just here to give you these documents." Some reviews lacked timely notice or participation, yet later records represented that assistance or participation occurred. Plaintiff told them he needed preparation time, timely disclosure, and an assistant who would meet beforehand, explain the process and rights, help prepare and present his position, and address effective communication, citing relevant policies. Material withheld or supplied only after use prevented timely challenges to mental-health and confidential-source information, which remained in later packets despite correction requests.

39. A Dec. 28, 2023, safety assessment prepared by A. GUERRERO for the 2024 DRB found Plaintiff's placement concerns valid and recommended RCGP. It relied in part on source information predating GUERRERO's Oct. 9, 2023, report but did not explain why the earlier report had treated the same concerns as unverified.

**D. 2024 DRB and ICC Proceedings — Due Process and Eighth Amendment Conditions**

40. A Jan. 12, 2024, notice assigned MATTA as Plaintiff's staff assistant because of the proceeding's complexity and Plaintiff's mental-health and TABE records. MATTA did not meet with him to review the complete packet, explain the process or rights, identify material issues, or assist preparation before the Jan. 18 hearing.

41. At the Jan. 18, 2024, DRB, BROOMFIELD chaired; HARDEN participated for OCS; TAPIZ reviewed and summarized the materials aloud; and E. Thomas and psychiatrist J. Giovacchini attended. Decisions were collective and followed closed deliberations. The Chrono acknowledged a TABE score of 2.6, no prior DRB hearing, and no SHU-eligible conduct in the preceding twenty-four months. The Board reviewed housing/activity, programming, psychiatric, and safety records. Plaintiff told BROOMFIELD, HARDEN, and TAPIZ about his section 2602 history, serious mental illness and deterioration, prolonged isolation, false

STG information, staff-linked dissemination and notoriety, threats, setup concerns, and Corcoran- and yard-specific risks. BROOMFIELD said he was "not a doctor" and DRB knew of the media activity but was not addressing it there.

42. The Jan. 18, 2024, DRB continued Administrative RHU, directed Corcoran ICC to conduct 180-day reviews of current behavior, disciplinary status, case and safety factors; obtain a current photograph; recommend placement; and return or refer the case to DRB by November 18, 2024. Chronos dated Jan. 31 and Feb. 1, 2024, cited asserted lack of self-improvement, programming, work, training, or educational effort, and failure to correct violent or disruptive behavior but did not reconcile a Sep. 28, 2023, staff account that Plaintiff programmed without problems. BROOMFIELD recommended tattoo removal; Plaintiff requested it from ZAMORA and ICC and filed grievance 609646 after Corcoran denied access.

43. On Feb. 20, 2024, an ICC involving MATTA, ZAMORA, CAMPBELL, GONZALES, T. Henne, C. Samari, A. GUERRERO, V. Pena implemented the DRB decision, recognized the determinate term as served, lifted the SHU holding status, changed Plaintiff to AS-5, and continued Administrative RHU. CAMPBELL had notice through tier presence, grievances, requests of hazardous conditions, serious self-injury, prolonged isolation, and inactivity, yet reviewed and signed the continuation. Plaintiff pleads the Jan.–May 2023 hazardous-cell events in *Osuna v. Campbell* only as notice and vulnerability, not for duplicate damages. The Chrono identified ZAMORA as staff assistant and recorded a pre-committee explanation, effective communication, no TABE score, adequate activities of daily living, and appropriate staff interactions. ZAMORA had only delivered documents and declined requests to review or correct records, explain the process, or help prepare. Plaintiff disputed the entries and showed staff the existing TABE score and conflicting treatment and crisis records.

44. Although the Feb. 20, 2024, ICC recorded Plaintiff as AS-5, Corcoran applied more restrictive D1-D-type privileges. Plaintiff grieved the discrepancies and told ZAMORA, MATTA, and ICC they conflicted with his recorded status and 15 C.C.R. § 3044. The unresolved discrepancies restricted canteen, property, package items, visits, other privileges.

45. The Feb. 20, 2024, Chrono set May 15 as the next review, but Plaintiff received no notice,

attendance, current photograph, behavioral or disciplinary review, updated case-factor or safety assessment, or placement recommendation. Through Jan. 2026, he repeatedly asked MATTA, ZAMORA, JACKSON, GARZA about the directed 180-day reviews, requested notice and participation; they said no review was occurring, "what hearing," or only DRB controlled release. The Oct. 15, 2024, and Oct. 29, 2025, referrals did not cure the omissions.

46. DRB materials contained two documents dated May 2, 2023, describing a purported prolonged-RHU psychiatric evaluation but naming different clinicians. Plaintiff alleges no evaluation occurred. He identified the discrepancy and requested correction, but later reviews treated the uncorrected evaluation as completed.

**E. Confidential Information and Source Reliability — Fourteenth Amendment Due Process**

47. CDCR identifies the source notices as confidential-information disclosures. Plaintiff alleges Corcoran personnel created or spread inflammatory narratives, displayed nonpublic 19CM-1882 material to inmates, solicited or influenced statements, selected adverse anonymous allegations, and supplied the resulting material to ICC and DRB to support Corcoran retention. The disclosures were inconsistent: some safety information was corroborated or treated as credible, while adverse allegations used against Plaintiff lacked disclosed corroboration or conflicted with other records.

48. A Dec. 28, 2023, confidential-information disclosure bearing TAPIZ's name summarized a Sep. 27 source statement that Plaintiff would be "getting set up" if endorsed to a yard, would defend himself, and had become a target because staff disclosed his case factors. It also recorded housing staff saying he programmed without problems, identified systematic safety concerns at KVSP and CCI because active 2-5 members or associates were there, and recommended RCGP. The disclosure noted but did not corroborate an allegation that staff informed inmates about Plaintiff and posted 19CM-1882 photographs online.

49. A July 12, 2024, confidential-information interview, incorporated into the Sep. 24, 2024, ISU/IGI assessment, said publicity, articles, and videos placed Plaintiff in a "negative" view and could produce a "negative response," targeting, confrontation, or assault by inmates seeking notoriety. ISU/IGI treated the notoriety danger as potentially valid. Plaintiff told

officials that current and former staff disseminated, published, or publicly commented on inflammatory and nonpublic material about him, conduct CDCR had addressed through granted or adjudicated grievances.

50. Other adverse source assertions were weaker or contradicted. Earlier material repeated hearsay that Plaintiff wanted to remain at Corcoran despite his grievances and transfer requests. During the related safety and placement assessment, BETANCOURT and ESPINO received reports of documented threats and the contemplated Level III non-designated or 50/50 override, opposed lower-level placement, and favored Level IV. Their assessment treated Plaintiff as active in, or refusing to disassociate from, an STG based on one anonymous allegation without disclosed independent corroboration, formal validation, an STG disciplinary finding, or a validated-status update. Plaintiff denied it and cited CDCR records stating "With STG Nexus: No."

51. Multiple incarcerated persons separately told Plaintiff that ISU or IGI personnel delayed or conditioned debriefing or dropout matters on providing information about him; one said staff directed him to identify Plaintiff as STG-affiliated and he refused. Plaintiff also reported that an inmate source associated with the false rapist narrative wrote or spread it in the housing unit. Plaintiff told counselors, ISU/IGI, ICC, and DRB that he had never been charged with or found guilty of a sex offense and had no STG RVR supporting the characterizations; ZAMORA also recorded no sex offenses. He requested investigation and correction, but the adverse material remained in use.

52. After Plaintiff served the related SHU term, ICC and DRB continued using confidential-source material reflected in varying, unreconciled accounts to support RHU retention, without providing the disclosures, dates, reliability bases, or corroborating records needed for meaningful rebuttal; the material remained adverse regardless of characterization.

**F. Ongoing Safety Threats — Eighth Amendment Failure to Protect**

53. While JOHNSON was pressing Plaintiff to renounce documented safety concerns and accept anticipated yard placement, Plaintiff gave ZAMORA, JOHNSON, MATTA, ICC, and Corcoran safety staff evidence of online threats tied to such movement. An account Plaintiff

identified as belonging to or associated with an SATF officer said "the homies" would get the "[real] justice soon." Plaintiff reported it while JOHNSON urged him to disclaim safety concerns and accept Tehachapi, Kern Valley, or another Level IV yard. The account disappeared after Plaintiff reported it to ISU/IGI.

54. The confidential-information record did not uniformly discredit Plaintiff's safety reports. Corcoran corroborated or treated as credible the notoriety-based targeting risk, the warning that Plaintiff was being set up, and the risk of forced self-defense. It did not corroborate the specific allegation that staff showed inmates 19CM-1882 photographs or spread inflammatory narratives through podcasts or social media, although granted or adjudicated grievances acknowledged staff media activity. By contrast, the adverse STG/refusal-to-disassociate characterization used against less restrictive placement rested on anonymous information without disclosed independent corroboration or completed validation. Plaintiff identified the disparity and requested investigation and correction.

55. An Aug. 7, 2025, STG-II source said Plaintiff was unsafe because inmates across SNY and general-population yards falsely accused him of being a rapist or sex offender. A Jan. 2, 2026, disclosure delivered by GARZA likewise documented that the false accusation had spread across SNY yards and would impede safe placement, showing another SNY yard would not remove the risk. Despite notice, Defendants continued Corcoran retention and proposed placements while adverse STG material blocked less restrictive alternatives. Plaintiff alleges this selective treatment prolonged a substantial risk of assault or forced self-defense and prevented reliable safe-placement review.

**G. Jan. 2025 DRB Proceedings — Procedural Due Process, Risk, and Release Criteria**

56. At the Jan. 16, 2025, DRB, then-DAI Director JONES, Classification Services Unit specialist TAPIZ, and deputy director BENAVIDEZ participated in the collective review. JACKSON was assigned as staff assistant because of Plaintiff's reading limitations and the review's complexity, although the Chrono marked TABE unavailable/not applicable. It stated JACKSON met with Plaintiff "due to the complexity" and helped prepare and present his position. He did not; JACKSON only delivered notice, saying, "I'm just here to give you

notice of the DRB hearing." Plaintiff requested assistance and received none.

57. At the hearing, BENAVIDEZ said Plaintiff could ask questions. When he tried to explain denied assistance, missing materials, safety and notoriety concerns, and the conflict between section 2602 records treating conduct and deterioration as serious mental illness and RVR/classification records treating the same conduct as willful misconduct warranting punishment and isolation, BENAVIDEZ interrupted because his statements did not "sound like questions." Plaintiff was not permitted to state or complete his position. He nevertheless raised the conflicting records, staff-created publicity, online threats, Corcoran- and yard-specific risks, missing materials, and safer-placement requests. JONES responded, "I know, I know." DRB continued the placement.

58. At that hearing, Plaintiff asked what he had to do to be released from indeterminate RHU/ SHU. Then-DAI Director JONES stated that one year without a serious write-up or RVR would get him out. By Jan. 8, 2026, Plaintiff had completed over one year without a sustained new write-up and had no serious new RHU-eligible conduct during 2025.

59. Plaintiff requested ETO and educational programming. Grievance 686399, filed Jan. 22, 2025, alleged that on Jan. 20, 2025, his neighbor attended an ETO educational activity and program director M. Robicheaux said the warden had removed Plaintiff from the list. Plaintiff alleges CAMPBELL was that warden and knew through requests and grievance responses that no comparable in-cell program existed. Corcoran responded that in-cell education or activities were available and out-of-cell programming was discretionary or barred by housing status or asserted violence concerns. No meaningful substitute was provided, yet later ICC and DRB records used limited programming, education, and out-of-cell participation against Plaintiff without noting his requests and exclusion.

60. Plaintiff repeatedly requested RCGP, PHU, or safer non-designated placement and informed counselors, ICC, and DRB that the applicable program-failure and former RCGP framework did not support indefinite RHU retention. ICC did not forward or adopt the recommendation, and later review used the inconsistent reports without providing a current reason for rejecting RCGP or another identified less restrictive alternative.

**H. Aug. 2025–Mar. 2026 — Restrictive Housing and Corcoran-Specific Consequences**

61. Plaintiff reported that the same Corcoran ISU unit involved in handling nonpublic 19CM-1882 material, and later identified as a source of leaked photographs, also generated safety information used in his RHU reviews. He pleads this only to show the alleged conflict in Corcoran-controlled safety review, not to challenge the criminal prosecution.

62. On Mar. 12, 2026, Kings County Superior Court granted confidential visits in 19CM-1882. Corcoran nevertheless had used/been using ordinary visiting rooms because of Plaintiff's RHU status; nearby staff with activated body-worn cameras could hear, monitor, and record attorney-client conversations. Corcoran also recorded calls requested, approved, scheduled, and represented as confidential legal calls. Staff said his housing status prevented other accommodations. Plaintiff pleads this only as a continuing consequence of Corcoran and RHU retention and evidence of the institution-specific conflict, not as a separate challenge to 19CM-1882, and does not place privileged substance at issue.

63. During 2025–2026, GARZA delivered hearing documents but declined requests to explain them or assist preparation, stating he was only delivering documents. He later said ICC made no placement or transfer recommendation and no 180-day review was occurring. Plaintiff requested notice and participation but received neither.

64. CDCR affixed a High Notoriety administrative determinant on Apr. 30, 2019. On Oct. 29, 2025, ICC nevertheless recorded that Plaintiff was not a public-interest case and his transfer remained DRB-controlled, without reconciling determinant, staff-created publicity and dissemination, granted/adjudicated grievances, documented threats. ICC continued restrictive placement and forwarded disciplinary, safety, STG, source material for the Jan. 8, 2026, DRB.

65. At the Jan. 8, 2026, DRB, JONES, TAPIZ participated in the collective review. GARZA had delivered an incomplete packet omitting late-2025 refusal-to-disassociate material authored or supplied by GONZALES. TAPIZ summarized the omitted allegation aloud and stated in substance that Plaintiff had told GONZALES he would not drop out or disassociate from a gang, as though it were Plaintiff's direct statement. Plaintiff immediately denied making it, denied the STG allegation, and requested the record. The cited GONZALES material

attributed the allegation to one anonymous source, not Plaintiff, and was not provided at least 24 hours before the hearing or afterward. DRB relied on it not to release Plaintiff and continued Administrative RHU or equivalent confinement without formal STG validation or serious new RHU-eligible conduct.

66. Plaintiff requested the underlying GONZALES record for his grievances and identified the disputed statement and incident. Corcoran refused to provide it but adjudicated the grievance anyway. Without the allegation, timing, reliability basis, or corroboration, Plaintiff could not prepare or rebut it, contributing to continued restrictive confinement and lost liberty.

67. Plaintiff first learned of and obtained the Razo profile through a 2026 public filing in *Osuna v. Campbell*. Before disclosure, the profile and derivative STG entries had been used in the 2023 MERD and classification process, while materially similar adverse characterizations remained available for later ICC, DRB, classification, and safety decisions. Concealment prevented timely identification and challenge.

**I. Injuries and Continuing Risk — Eighth and Fourteenth Amendment Harm**

68. Each challenged ICC and DRB decision prolonged the alleged physical, psychiatric, and safety harms. Denial of material records, assistance, notice, participation, and an opportunity to express his views prevented timely rebuttal. State procedures are cited as evidence of the constitutional deprivation, not standalone claims; the defects caused or prolonged Corcoran retention and lost release, transfer, and safer-placement opportunities.

69. False sex-related, STG, "25'er," "Joker," dropout, refusal-to-disassociate, wanted-to-remain, no-safety-concern, and no-suicide-history narratives, with staff-created publicity and incomplete safety reports, exposed Plaintiff to hostility and documented threats. The Jan. 2, 2026, disclosure that a false rapist accusation had spread across SNY yards showed ongoing risk of assault or forced self-defense. During escorts or movement, Plaintiff was called a rapist, threatened or harassed, and confronted with false inflammatory staff statements. He grieved and complained about the statements, dissemination, and resulting threats.

70. Except for the corrected sex-history entry, disputed STG, moniker, safety, programming, suicide-history, and source information remains available for future decisions. Plaintiff

remains at Corcoran in restrictive housing, exposed to psychiatric deterioration with self-harm/injury, reduced privileges, heat and exercise deprivation, violence, and renewed reliance on those records. JONES, HARDEN, and SILVA, through their current offices, can implement prospective classification, safety, records, housing, and transfer relief.

## VI. CLAIMS FOR RELIEF

### CLAIM ONE: Eighth Amendment—Excessive Conditions of Confinement

71. Plaintiff asserts this claim for damages against JOHNSON, CAMPBELL, BROOMFIELD, HARDEN, TAPIZ, JONES in their individual capacities, and for prospective relief against JONES and SILVA in their official capacities.

72. From May 2023 through Jan. 2026, Plaintiff spent most days in a small concrete cell, sometimes twenty-four hours on consecutive days; received yard only a few times during approximately one year; lacked meaningful out-of-cell programming; had no fan while taking heat-warning medication during temperatures above 100°F. The duration and combined isolation, exercise deprivation, heat exposure posed a substantial risk of serious physical and psychiatric harm.

73. JOHNSON had direct tier and cell access and received reports of near-total cell confinement, almost no yard or programming, and worsening psychiatric symptoms, yet threatened prolonged DRB retention when Plaintiff refused an unsafe placement. CAMPBELL had tier presence and received or delegated grievances and requests documenting hazards, self-injury, isolation, inactivity; removed Plaintiff from ETO or education without a comparable in-cell program; signed the February 20, 2024, continuation. Their conduct prolonged the conditions.

74. BROOMFIELD, HARDEN, TAPIZ received the DRB packet, heard Plaintiff report prolonged in-cell confinement, almost no yard or programming, and deterioration, and participated in the Jan. 18, 2024, continuation; TAPIZ summarized the records. JONES later received reports of continuing conditions and harm and participated in continuations after Plaintiff met her release metric. Their conduct prolonged his exposure.

75. Despite notice of the conditions and resulting risk, each named Defendant failed to take available corrective measures, causing Plaintiff's unjustified continued RHU/SHU retention

and prolonged exposure to the excessive conditions. This constituted deliberate indifference under the Eighth Amendment.

76. As a result, Plaintiff suffered exercise deprivation, heat-related illness requiring treatment, physical pain, recurring self-injury, psychiatric decompensation, crisis placements, impaired functioning, and continuing injury. JONES and SILVA can provide prospective relief.

**CLAIM TWO: Fourteenth Amendment—Procedural Due Process**

77. Plaintiff asserts this claim for damages against JOHNSON, MATTA, ZAMORA, JACKSON, GARZA, CAMPBELL, BROOMFIELD, HARDEN, TAPIZ, JONES, BENAVIDEZ, GUERRERO, BETANCOURT, ESPINO, GONZALES in their individual capacities, and for prospective relief against JONES, HARDEN, SILVA in their official capacities.

78. Plaintiff's years-long RHU/SHU confinement and severe restrictions imposed an atypical and significant hardship, creating a protected liberty interest. He asserts no freestanding right to a classification, privilege group, housing assignment, institution, or enforcement of CDCR regulations. The claim rests on nondisclosure, denied assistance, inaccurate records, omitted reviews, restricted participation, and the resulting loss of meaningful notice, rebuttal, and genuine review—not technical noncompliance alone.

79. Due process required timely notice, a meaningful opportunity to understand and rebut the grounds for retention, and genuine periodic review. *Wilkinson v. Austin*, 545 U.S. 209, 225–29 (2005). Plaintiff's assigned-assistance determinations and documented communication limitations required sufficient assistance for meaningful participation.

80. JOHNSON threatened DRB retention and participated in the 2023 referral; CAMPBELL signed the Feb. 20, 2024, continuation; and BROOMFIELD, HARDEN, TAPIZ, JONES, and BENAVIDEZ participated in the identified collective DRB continuations. TAPIZ reviewed and summarized the material. Closed deliberations prevent Plaintiff from knowing each vote before discovery. Their conduct prolonged confinement.

81. At the Jan. 16, 2025, DRB, BENAVIDEZ restricted Plaintiff's presentation/rebuttal despite denied assistance and missing materials. JONES identified one year without a serious RVR as the release criterion. After Plaintiff exceeded it, JONES participated in the Jan. 8, 2026,

continuation based partly on previously undisclosed source material. Their conduct denied meaningful rebuttal and genuine periodic reconsideration, prolonging restrictive confinement.

82. MATTA, ZAMORA, JACKSON, GARZA denied assigned assistance and meaningful participation and, despite requests and actual notice of policy requiring it, failed to correct material records or provide directed review notice, photographs, or recommendations. Records nevertheless represented that assistance, communication, agreement, evaluation, or review occurred. Their conduct impaired Plaintiff's preparation, response, access to current review.

83. GUERRERO prepared inconsistent safety reports, first treating concerns as unverified and later finding them valid using earlier source information. Plaintiff alleges BETANCOURT and ESPINO knew the anonymous STG allegation and assessment were false or unsupported and supplied them to block contemplated Level III or 50/50 placement after expressing personal opposition to such placement; ICC and DRB relied on them. GONZALES supplied the withheld late-2025 refusal-to-disassociate material, and TAPIZ allegedly knew it attributed the statement to an anonymous source but presented it as Plaintiff's direct statement. Their conduct prevented meaningful rebuttal and supported Corcoran retention.

84. The process used concealed Razo-derived STG information, withheld GONZALES material, incomplete 2021 disciplinary material, contradictory clinical and disciplinary descriptions, composite or undated source packets, denied programming treated as nonparticipation, and unreconciled notoriety and privilege information. Plaintiff disputed these defects and requested disclosure and correction, but adverse information remained in later decisions.

85. ICC, DRB, grievance reviews did not cure the defects: directed reviews were omitted, grievances were returned or decided without withheld records, no level gave a current reason for retention or rejected identified less restrictive alternatives, including RCGP, which a safety assessment recommended and Plaintiff repeatedly requested. JOHNSON threatened ten-year retention if Plaintiff would not renounce safety concerns; JONES said one year without a serious RVR would secure release. After Plaintiff exceeded that period, DRB used withheld refusal-to-disassociate allegation to continue confinement. Defendants still called him a program failure without explaining why RCGP was unsuitable. The process did not genuinely

reconsider current facts. CDCR's May 2026 RHU rulemaking characterizes comparable AS restrictions as disciplinary "negative consequences" and requires 180-day review, less-restrictive-housing consideration, and written reasons, confirming the omissions' materiality.

86. Defendants knew of the procedural defects, disputed records, and resulting confinement but failed to correct them. Their conduct caused additional RHU confinement and lost release or transfer opportunities, denying timely notice, meaningful rebuttal, and genuine periodic review under the Fourteenth Amendment. The challenged records and procedures remain available for future use; JONES, HARDEN, and SILVA can provide prospective relief.

**CLAIM THREE: Eighth Amendment—Deliberate Indifference**

87. Plaintiff asserts this claim for damages against JOHNSON, MATTA, ZAMORA, CAMPBELL, BROOMFIELD, HARDEN, TAPIZ, JONES, BENAVIDEZ, GUERRERO, BETANCOURT, ESPINO, GONZALES in their individual capacities, and for prospective relief against JONES, HARDEN, SILVA in their official capacities.

88. Plaintiff faced objectively serious mental-health and safety risks, including severe mental illness, decompensation, recurring serious self-injury and crisis placements, staff-linked dissemination of inflammatory narratives, credible threats, false rapist and STG accusations, and substantial risk of assault or forced self-defense.

89. JOHNSON, MATTA, and ZAMORA received reports of worsening psychiatric symptoms, staff-linked dissemination, online and inmate threats, and Corcoran- and yard-specific risks. JOHNSON conditioned release on abandoning safety concerns and accepting an identified unsafe placement; MATTA and ZAMORA continued ICC processing without a protective response or safer placement. CAMPBELL received notice through tier presence, grievances, and requests of serious mental illness, self-injury, hazards, isolation, and lack of programming, yet removed Plaintiff from ETO or education and signed the Feb. 20, 2024, continuation. Their conduct prolonged exposure to known risks.

90. At the Jan. 18, 2024, DRB, BROOMFIELD, HARDEN, TAPIZ received the packet, heard reports of serious mental illness, staff-linked dissemination, threats, setup concerns, Corcoran- and yard-specific risks. The packet included ISU/IGI reporting of notoriety-based targeting,

staff-linked dissemination, assault concerns. BROOMFIELD acknowledged DRB knew of the media-related risks but would not address them; TAPIZ summarized the records; all three continued the placement. In 2025, JONES acknowledged the core concerns while BENAVIDEZ cut off Plaintiff's presentation. In 2026, TAPIZ presented an anonymous GONZALES allegation as Plaintiff's direct statement. Their conduct prolonged exposure.

91. GUERRERO knew of documented safety and mental-health risks but supplied inconsistent reports without correction before placement use. Plaintiff alleges BETANCOURT and ESPINO knowingly supplied a false or unsupported STG assessment to block safer Level III or 50/50 placement, and it was relied upon. GONZALES supplied later refusal-to-disassociate material used to defeat release despite the safety record. Their conduct obstructed safer placement and prolonged institution-specific danger.

92. Each named Defendant knew of substantial mental-health or safety risks yet failed to take available reasonable measures, including independent review, corrected records, higher-level treatment, and non-Corcoran placement. This constituted deliberate indifference to serious mental-health needs and failure to protect under the Eighth Amendment.

93. As a direct and proximate result, Plaintiff suffered psychiatric decompensation, recurring self-inflicted wounds, physical pain, crisis placements, fear and increased risk of assault or forced self-defense, continuing injury. JONES, HARDEN, SILVA can provide prospective relief.

## VII. REQUEST FOR RELIEF

94. Plaintiff requests judgment against Defendants and the following relief:

95. Preliminary and permanent injunctive relief requiring Plaintiff's immediate release from RHU/SHU or equivalent restrictive housing and transfer out of CSP-Corcoran.

96. Preliminary and permanent injunctive relief directing Defendants to transfer Plaintiff to San Quentin Rehabilitation Center, absent a specific, documented, and legitimate penological reason independent of the challenged information and practices alleged herein, disclosed to Plaintiff with a meaningful opportunity to challenge it; and, if such placement is thereafter determined genuinely unavailable, to a comparably safe, less restrictive placement that does not substantially reproduce the conditions challenged in this action.

97. An injunction requiring PHU status, or functionally equivalent protective status/safeguards, at San Quentin Rehabilitation Center or the receiving non-Corcoran institution, without using any housing designation or program at CSP-Corcoran as a substitute for transfer.

98. Compensatory damages according to proof, but not less than $5,000,000, jointly and severally where permitted; nominal damages of $1 against each liable individual Defendant for each constitutional violation; punitive damages of not less than $100,000 against each individual Defendant meeting the required standard; and costs and interest as permitted by law.

99. An injunction prohibiting Plaintiff's return to CSP-Corcoran; placement at SATF, NKSP, SVSP, Pelican Bay, or another institution or yard presenting a documented safety conflict supported by contemporaneous records, grievances, court records, source material, or other independently reviewable evidence; and renewed RHU/SHU or equivalent restrictive confinement under any current or successor policy, label, privilege group, or administrative term based on challenged records or materially derivative allegations. Any alternative placement or renewed restrictive confinement shall be reviewed outside Corcoran by unconnected officials using original or contemporaneous source material, with a meaningful opportunity for Plaintiff to identify errors and respond and written findings sufficient for judicial review.

100. An injunction requiring itemized inventory and secure transfer of Plaintiff's personal and legal property, identifying any item withheld, lost, damaged, destroyed, or claimed unauthorized.

101. An injunction requiring Defendants to correct Plaintiff's classification and related records and remove, correct, or bar reliance on the materially false, unsupported, misleading, or procedurally invalid documents and entries identified in this Complaint.

August 14, 2026,

p.p. Jamie Osuna